UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ABDIFATAH SHARIF OMAR,

    Plaintiff,

v.

HEATHER WEYKER, *in her individual capacity as a St. Paul Police Officer*; JOHN BANDEMER, *in his individual and official capacities as a St. Paul Police Sergeant*; ROBERT ROES 1-3, *in their individual and official capacities as supervisory members of the St. Paul Police Department*; THE CITY OF ST. PAUL,

    Defendants.

Case No. 16cv1243 (JNE/TNL)
ORDER

## I.     INTRODUCTION

Plaintiff Abdifatah Sharif Omar alleges violations of his constitutional rights in an investigation that led to his indictment by a federal grand jury and his subsequent arrest. He sues Defendants Heather Weyker, a police officer for the St. Paul Police Department in Minnesota; John Bandemer, a St. Paul Police Department sergeant who is alleged to have been Weyker's supervisor; Robert Roes 1-3, who are allegedly supervisory St. Paul police officers; and the City of St. Paul ("St. Paul"). Weyker and Bandemer move to dismiss A. Omar's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and on absolute and qualified immunity grounds. Dkt. No. 40. St. Paul moves on behalf of the City of St. Paul and Robert Roes 1-3 for judgment on the pleadings pursuant to Rule 12(c). Dkt. No. 46.

The investigation at the core of A. Omar's civil complaint targeted a suspected venture involving the sex-trafficking of minor girls across Minnesota, Tennessee, and Ohio. The investigation resulted in the criminal indictment of thirty people, mostly Somali, in the Middle

District of Tennessee in 2010-2011 ("Tennessee Case"). A. Omar alleges that Weyker fabricated evidence about him and others throughout the investigation, resulting in a tainted indictment that was further corrupted by Weyker's continuing deception, and causing his arrest and detention without probable cause.

Nineteen of A. Omar's co-defendants in the Tennessee Case bring separate suits similarly alleging constitutional violations, and a twenty-first person brings another related civil suit. The parties agreed to coordinated briefing on the Defendants' motions. The Court assumes familiarity with its fuller opinion in one of the related cases, *Osman v. Weyker, et al.*, No. 16cv908 ("Osman Opinion") (filed simultaneously herewith), and will not repeat that opinion's discussion verbatim here, given the overlap in allegations and arguments. A. Omar is represented by the same attorneys as the plaintiff in that case, and their attorneys filed consolidated opposition papers to the Defendants' motions. *See* Osman Pls.' Opp. to St. Paul Mot., Dkt. No. 51; Osman Pls.' Opp. to DOJ Mot. to Dismiss ("Osman DOJ Opp."), Dkt. No. 57.

The Court held a hearing on Defendants' motions on May 3, 2017, and now grants both motions.[1]

## II.    APPLICABLE STANDARDS

A motion to dismiss or a motion for judgment on the pleadings is appropriately granted "only when there is no dispute as to any material facts and the moving party is entitled to judgment as a [m]atter of law." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (citation omitted). To survive a Rule 12 motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

---

[1] The United States also filed a Motion to Substitute and Dismiss, which was mooted by stipulation as recognized by the March 6, 2017 Order Permitting the Osman Plaintiffs to Amend Complaints. Dkt. No. 61. Pursuant to that order, A. Omar filed a First Amended Complaint [Dkt. No. 62] ("FAC"), which is thus the operative complaint subject to these Rule 12 motions.

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Haney v. Portfolio Recovery Assocs., LLC*, 837 F.3d 918, 924 (8th Cir. 2016), *as amended* (Dec. 27, 2016). *See also* Osman Op. 3-4.

### III. ALLEGATIONS

Most of the salient allegations are similar to those alleged by Osman and summarized and analyzed in the Court's order in that case. *See, e.g.*, Osman Op. 4-8. The Court briefly recounts some allegations in A. Omar's First Amended Complaint and some facts gleaned from the Tennessee Case record.[2]

In 2009, A. Omar lived in Minnesota but spent some time in Nashville, Tennessee, visiting with his aunt. FAC ¶ 10. In April 2009, a group of "young Somalis, mostly men and mostly unknown at the time to Omar, was taken into custody by the Nashville Police Department, including Jane Doe Two," and Jane Doe Two, after first telling local detectives one story that did not mention any sex for money, told Weyker—the lead investigator on the case— that Jane Doe Two had committed acts of prostitution and sex-trafficking over the past few days. FAC ¶¶ 19-22, 35. In June 2009, while A. Omar was staying with his aunt, some friends from Minneapolis came to visit, and because it would have been too crowded for them all to stay with his aunt, he rented them a hotel room. FAC ¶ 12. He "had no intention, desire, or expectation that any commercial sex acts, nor sex acts with minors take place in the hotel room" and to the best of his knowledge, "no such acts took place in the hotel room." *Id.*

In an October 20, 2010 indictment, A. Omar was charged with multiple crimes, the "thrust" of which "was that [he] engaged in a conspiracy to recruit and transport minors for the purpose of engaging in commercial sex acts, and to obstruct the investigation thereof." FAC

---

[2] The Court may take judicial notice of public documents in the Tennessee Case record. *Greenman*, 787 F.3d at 887.

3

¶ 25. "No such conspiracy existed, and Defendants knew it." *Id.* The indictment charged A. Omar in nine counts. *See* Indictment ("Ind't"), *United States v. Omar*, No. 3:10cr260, Dkt. No. 3 (M.D. Tenn. Oct. 20, 2010). Two counts alleged participation in a sex-trafficking conspiracy in violation of 18 U.S.C. § 1591(a) (Counts 1 and 2). Three counts, Counts 3, 4, and 19, alleged obstruction of justice or conspiracy to obstruct justice. More specifically, Counts 3 and 4 alleged that co-defendant Haji Osman Salad "spoke to" A. Omar and asked him "to talk to Jane Doe Two's parents," that A. Omar said "that he would do so," and that Salad told him "to make sure Jane Doe Two's family cannot come to court." Ind't ¶ 72; *see also* Ind't ¶ 74-75 (similar allegations). Counts 3 and 4 also alleged that A. Omar gave Salad some information about Salad's phone, which Salad had given to "an unindicted co-conspirator" for "the purpose of concealing the cellular phone from law enforcement." Ind't ¶¶ 71, 73. In addition, Count 15 charged A. Omar with conspiring to transport stolen goods in interstate commerce. Count 16 charged A. Omar with conspiracy to transport a stolen vehicle across state lines. Count 17 charged him with conspiring to use a fake driver's license to commit a crime. Finally, Count 18 charged him with conspiring to commit credit card fraud. A First Superseding Indictment charged him in the same counts. *United States v. Omar*, No. 3:10cr260, Dkt. No. 36 (M.D. Tenn. Nov. 3, 2010).

A. Omar was arrested in November 2010 after being indicted. FAC ¶ 26. Because of the alleged violations of 18 U.S.C. § 1591, he "was subject to presumptive detention and was ordered detained pending trial." FAC ¶ 28. For some period while he awaited trial, A. Omar was released on home monitoring, but he was held in custody for nearly two years. FAC ¶ 54.

"Despite Omar's utter lack of connection" to the events that occurred in Nashville in April 2009 involving Jane Doe Two, he was "indicted in a sex-trafficking conspiracy case

involving that incident based on evidence fabricated by Weyker." FAC ¶ 23. "Weyker made the April 2009 trip a cornerstone of her fabricated sex-trafficking conspiracy." FAC ¶ 24. The indictment also alleged that A. Omar rented the hotel room in June 2009 "for the purpose of facilitating a commercial sex act," which was not true. FAC ¶ 13; *see* Ind't ¶ 63. "This was the only overt act of any particularity alleged in conspiracy against Omar regarding the commercially sex-trafficking of minors." *Id.* "Weyker also manipulated and coerced two Somali males, whose identities are known to Plaintiff, into falsely implicating Omar in the sex-trafficking conspiracy and other allegations." FAC ¶ 29.

Like Osman, A. Omar alleges that the charges of a widespread sex-trafficking conspiracy were baseless and that Weyker fabricated "the overwhelming majority of the critical evidence supporting the indictments in this alleged conspiracy," FAC ¶¶ 33-34; that Weyker manipulated and coerced Jane Doe witnesses, including Jane Doe One, into lying, FAC ¶¶ 16, 41-43; that Weyker was motivated to falsify evidence by a desire for glory, FAC ¶ 1; that Weyker "worked with almost no supervision by her employer and principal" the St. Paul Police Department, FAC ¶ 45; and that indications of Weyker's fabrication included her rough notes, questions surrounding Jane Doe Two's age and her trip to Nashville in April 2009, the acquittals of nine co-defendants who went to trial, and remarks about Weyker and the case by the district and appellate courts in the Tennessee Case, FAC ¶¶ 14-15, 20, 22, 38-39, 49-53, 56.

Nine of A. Omar's co-defendants went to trial in Spring 2012, and the jury rendered its verdict in early May 2012. *See* FAC ¶ 47; *United States v. Adan*, 913 F. Supp. 2d 555, 560 (M.D. Tenn. 2012). A. Omar was originally set to stand trial with these co-defendants, but elected to be tried later with some other co-defendants. *Adan*, 913 F. Supp. 2d at 559. The jury acquitted six defendants on all charges, and in December 2012, the district court granted Federal

5

Rule of Criminal Procedure 29 motions for acquittal by the other three defendants on the basis of a variance. *Adan*, 913 F. Supp. 2d at 560, 579; *see also* FAC ¶ 50. In March 2016, the Sixth Circuit Court of Appeals issued an order affirming the district court's Rule 29 order. *See* FAC ¶ 51; *United States v. Fahra*, 643 Fed. Appx. 480 (6th Cir. 2016). The federal charges against A. Omar were then dismissed. FAC ¶ 60.

## IV. SUMMARY OF ARGUMENTS

A summary of the parties' arguments on these consolidated motions is included in the Osman Opinion at pages 8-10.

## V. LEGAL ANALYSIS

As explained fully in the Osman Opinion, pursuant to *Manuel v. City of Joliet*, 137 S. Ct. 911 (Mar. 21, 2017), A. Omar's claims sound, if at all, in the Fourth Amendment, not the Fifth or Fourteenth. *See* Osman Op. 11-13; *see also id.* at 17-22. His complaint is that "[b]ut for the evidence Weyker fabricated, no probable cause existed to detain or otherwise restrict [his] liberty." FAC ¶ 1. In other words, he complains "that a form of legal process resulted in pretrial detention unsupported by probable cause." *Manuel*, 137 S. Ct. at 919. So "the right allegedly infringed lies in the Fourth Amendment." *Id.* A "constitutional division of labor" applies to claims similar to A. Omar's. *Id.* at 920 n.8. Thus, because he challenges his pretrial detention, his claim is under the Fourth Amendment, but if he had been convicted and were to challenge the sufficiency of the evidence supporting that conviction, his claim would then be under the Due Process Clause of the Fourteenth Amendment because "once a trial has occurred, the Fourth Amendment drops out." *Id.* A. Omar's claims for substantive due process violations under the Fifth or Fourteenth Amendments therefore fail. *See also Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion).

6

The Court thus rejects the substantive due process claims on the basis of *Manuel* and *Albright*, but it also notes that to the extent these claims rely on the allegation that A. Omar was held in custody, rather than released on bond, because of the fabricated evidence supporting the sex-trafficking conspiracy charges, *see* FAC ¶ 28, this argument for a substantive due process claim fares no better. The Bail Reform Act requires a court to hold a detention hearing if the government moves to detain a pretrial defendant in a case that charges a violation of 18 U.S.C. § 1591. 18 U.S.C. § 3142(f)(1)(A) (2008). In that hearing, a number of procedural rights are afforded by the statute. *See id.* § 3142(f); *United States v. Stephens*, 594 F.3d 1033, 1038 (8th Cir. 2010). The court must consider (1) "the nature and circumstances of the offense charged, including whether the offense is . . . a violation of section 1591," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). If the court determines by clear and convincing evidence that there is no combination of conditions that could "reasonably assure the appearance of such person as required and the safety of any other person and the community," *id.* § 3142(f), then the court "shall order" the defendant's detention pending trial, *id.* § 3142(e). Although in a case in which the judge "finds that there is probable cause to believe that the person committed . . . an offense involving a minor victim under section . . . 1591," it "shall be presumed" that detention is necessary, that presumption may be rebutted by other evidence at the detention hearing. *Id.* § 3142(e)(3)(E). Moreover, the defendant's presumption of innocence remains in force at the detention hearing. *Id.* § 3142(j). A. Omar does not allege any facts about his detention hearing. Even crediting his allegations that Weyker fabricated evidence of a sex-trafficking conspiracy and fooled the grand jury into indicting him on those charges, *see* FAC

¶ 37, the Court could not reasonably infer that the sex-trafficking-related charges caused him to be held in custody, because the § 3142 presumption was rebuttable and multiple factors had to be considered. "The Government must first of all demonstrate probable cause to believe that the charged crime has been committed by the arrestee, but that is not enough." *United States v. Salerno*, 481 U.S. 739, 750 (1987). "In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id.* A. Omar was entitled, for example, to an evaluation of the weight of the evidence against him, yet he does not allege that Weyker played any role in tainting any such separate judicial determination, nor that she in any way affected an evaluation by a judge of A. Omar's history and characteristics. The silence in A. Omar's complaint on this topic leaves open the possibility that he waived his initial right to a hearing. More importantly, the record reflects that even after the trial of the nine co-defendants, a panel of the Sixth Circuit found that six of his co-defendants should remain in custody pending trial or retrial, based in part on an evaluation of the weight of the evidence at trial. *United States v. Fahra*, No. 13-5296, Dkt. No. 61-1 (6th Cir. Dec. 18, 2013) (submitted in this case at DOJ Reply Ex. BB). This fact further reinforces a conclusion that A. Omar fails to plausibly allege substantive due process violations on the basis of a § 3142 presumption.

Under the Fourth Amendment analysis, the Court must decide whether A. Omar plausibly alleges that the Defendants violated his right to be free from unreasonable seizure by arresting and detaining him without arguable probable cause, based on fabricated evidence.[3]

---

[3] Because the Court finds that only the Fourth Amendment, and not substantive due process, is applicable; because a Fourth Amendment claim in this case does not present a new context for a *Bivens* action; and because § 1983 and *Bivens* claims are analyzed similarly, the Court does not reach the question of whether A. Omar's claim should be brought under § 1983 or *Bivens*. *See* Osman Op. 13-17.

To evaluate whether a person's Fourth Amendment right has been violated by an arrest pursuant to a warrant that lacked probable cause, the court applies the analysis set out in *Franks v. Delaware*, 438 U.S. 154 (1978). *See Hawkins v. Gage Cty.*, 759 F.3d 951, 958-59 (8th Cir. 2014); *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101, 105 (1st Cir. 2013). Thus, the court considers whether there were deliberately or recklessly false statements made in support of a finding of probable cause and whether those statements were necessary to the finding of probable cause. *See Franks*, 438 U.S. at 156; *Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014). The court also considers whether material information was omitted with the intent to mislead or with reckless disregard as to whether the omission was misleading. *See Williams*, 772 F.3d at 1312; *Hawkins*, 759 F.3d at 959. If, setting aside the false statements (or adding in the omitted information), there was no probable cause to arrest, then the arrest violated the Fourth Amendment. *See Williams*, 772 F.3d at 1312-13; *Hawkins*, 759 F.3d at 958-59; *Hernandez-Cuevas*, 723 F.3d at 105. Probable cause "exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Greenman v. Jessen*, 787 F.3d 882, 888 (8th Cir. 2015) (citation omitted).

Where a plaintiff alleges that she was arrested without probable cause and the defendant asserts the qualified immunity defense, courts ask whether there was "*arguable* probable cause to arrest." *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016) (citing *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015)) (applying this standard to a Fourth Amendment claim for detention based on allegedly false and incomplete information in a probable cause statement).[4] "[T]he

---

[4] An arresting officer who had "a mistaken but objectively reasonable belief" that probable cause existed would be entitled to qualified immunity. *McCabe v. Parker*, 608 F.3d 1068, 1078 (8th Cir. 2010). A. Omar alleges, however, that there was no mistaken belief—

9

issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *New*, 787 F.3d at 899. "It is clearly established that the Fourth Amendment requires a *truthful factual showing* sufficient to constitute probable cause before an arrest warrant can issue." *Peterson v. City of Plymouth*, 60 F.3d 469, 477 (8th Cir. 1995) (emphasis added) (quoting *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994)).

### a. Analysis of A. Omar's Claim Under the Fourth Amendment

In considering whether A. Omar plausibly alleges a Fourth Amendment violation, the Court disregards mere conclusory statements, focuses on well-pleaded factual allegations and accepts them as true, and applies its judicial experience and common sense. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The Court also properly considers the Tennessee Case court record in assessing the pleadings. *See, e.g.*, *Greenman*, 787 F.3d at 887.

A. Omar's core allegations closely track Osman's. Like Osman, he alleges that a jury acquitted six defendants, and the court acquitted[5] the other three. In the Osman Opinion, the Court examines several orders and memoranda by the district court and two separate Sixth Circuit Court of Appeals opinions concerning the Tennessee Case, some of which both Osman and A. Omar cite. *See* Osman Op. 25-33. For example, A. Omar, like Osman, cites *United States v. Adan*, 913 F. Supp. 2d 555, 589 n.10 (M.D. Tenn. 2012), which refers to a July 31, 2012 detention hearing for A. Omar. In Osman's case, the Court found that some of these statements by judicial officers are remarkable, and that taken all together along with other well-pleaded

---

rather, Weyker knowingly fabricated the material evidence. The "arguable probable cause" standard arguably would not apply if Weyker intentionally misled, but A. Omar does not press the point, *see* Osman DOJ Opp. 34-35, and it is not dispositive here.

[5] The Court uses the word "acquittal" for consistency with the Tennessee Case opinions and the pleadings but has some reservations about it. *See* Osman Op. 23-25.

facts, they nudge Osman's Fourth Amendment claim over the *Iqbal* plausibility line. The Court further found that the fact that Osman was also indicted on obstruction of justice charges relating to the prosecution of the allegedly fabricated sex-trafficking-conspiracy case does not *per se* doom her claim. *See* Osman Op. 35-37. This case, however, is different.

Weyker and Bandemer argue that even if A. Omar plausibly alleges that Weyker fabricated evidence material to the indictment for sex-trafficking-related charges, the fact that he was also indicted in non-trafficking-related charges defeats his Fourth Amendment claim. They argue that A. Omar fails to plausibly allege that there was not probable cause to arrest him on the other crimes for which he was charged. *See* DOJ Br. 65-68. A. Omar counters that it is the Defendants' burden to establish their affirmative defense of arguable probable cause and that "too many fact issues remain at this stage for the Court to rule on the effects that other charges may have had on the Osman Plaintiffs' unlawful arrests." *See* Osman DOJ Opp. 34. Moreover, A. Osman argues there was no arguable probable cause to arrest him in 2010 "without the fabricated evidence," as shown by the fact that the government ultimately dismissed all charges against all remaining co-defendants. *See id.* at 35.

A. Omar alleges that "Weyker also fabricated and/or caused to be fabricated the evidence implicating Omar in the non-sex-trafficking charges." FAC ¶ 27; *see also* FAC ¶ 62 ("Omar never would have been indicted or detained had Weyker not fabricated evidence, coerced witnesses, and misled federal authorities."). But he does not allege any facts to lend plausibility to this conclusory statement. His allegation that he was never convicted of any crime in the Tennessee Case, FAC ¶ 27, is not sufficient because in a criminal case as lengthy and complicated as the Tennessee Case, it is not reasonable to assume from the Government's eventual dismissal of all charges, after an appeals court affirmed the grant of acquittals for three

11

co-defendants on the basis of a variance, that there was never probable cause to support *any* of the charges. A. Omar never specifically alleges that he was not in a conspiracy to transport stolen goods in interstate commerce (Count 15), to transport a stolen vehicle (Count 16), to use false identification (Count 17), or to commit credit card fraud (Count 18).[6] Those counts in the indictment are supported by numerous specific allegations of overt acts by A. Omar. *See, e.g.*, Ind't ¶¶ 101-04, 108, 140-43 (alleging, among other things, driving a stolen car and attempting to use stolen credit card information at specific retail locations). For example, Count 15 alleged that A. Omar and others stole approximately $120,000 in cash, along with other goods, from a business in Nashville on May 22, 2006, and that two days earlier, A. Omar had spoken with an unindicted co-conspirator about burglarizing that business. Ind't ¶¶ 101-02. It further alleges that on May 23, 2006, A. Omar transported the $120,000 in cash to Minnesota. Ind't ¶ 103. And it alleges that A. Omar conspired to commit several thefts in Ohio in September 2006. Ind't ¶¶ 104-06. In his civil complaint, however, A. Omar never alleges that, for instance, he did not help steal $120,000 or transport that cash to Minnesota. Nor, for example, does he allege any facts to dispute the absence of probable cause for Count 16, where the indictment alleged that on February 4, 2010, A. Omar had a key made for a particular Cadillac Escalade and that five days later, the Escalade was stolen and shortly thereafter registered with the Ohio Bureau of Motor Vehicles by some of his co-defendants. *See* Ind't ¶¶ 108-10. The absence of specific factual allegations as to these non-sex-trafficking-related charges defeats any argument that A. Omar has

---

[6] He also alleges conclusorily that there was no conspiracy to "obstruct the investigation" of the alleged sex-trafficking conspiracy. *See* FAC ¶ 25. As the fact section above reflects, the indictment alleged some specific acts by A. Omar in support of the obstruction of justice charges, but analysis of those charges is unnecessary because he fails to allege a Fourth Amendment violation with regard to the clearly non-sex-trafficking-related charges like Counts 15 through 18.

plausibly alleged that there was no probable cause to arrest him in November 2010 on any of the non-sex-trafficking-related charges in the operative indictment.[7]

Therefore, A. Omar's complaint must fail. Even if there were no probable cause to arrest him based on the allegedly spurious sex-trafficking-conspiracy charges, there is no Fourth Amendment violation where there is probable cause to arrest "for the violation of some other law." *Greenman*, 787 F.3d at 889 (citation omitted); *see also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (holding that there is no Fourth Amendment violation if there is probable cause to arrest based on any criminal offense, even if the officer's subjective reason for arresting was a different and unrelated offense); *Keil v. Triveline*, 661 F.3d 981, 986 (8th Cir. 2011). He "has failed to 'make out a violation of a constitutional right' in the first instance." *Greenman*, 787 F.3d at 888; *see also Keil*, 661 F.3d at 986.

The Court acknowledges A. Omar's grievance with having spent some of his pretrial detention in custody rather than out on bond. But detention comes in different forms and is a restraint on liberty in any form. *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("Even pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty."). The Fourth Amendment does not distinguish between the forms of pretrial detention; it "protects '[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures,'" and "'[a] person is seized' whenever officials 'restrain[] his freedom of movement' such that he is 'not free to leave.'" *Manuel*, 137 S. Ct. at 917 (citations omitted).

Defendant Weyker is entitled to qualified immunity. A. Omar has failed to plausibly allege a constitutional violation.

---

[7] The Court further notes that at least one of his co-defendants pleaded guilty to the credit-card conspiracy charged in Count 18. *See United States v. Nur*, No. 3:10cr260, Dkt. No. 2870 (M.D. Tenn. Oct. 5, 2012).

13

### b. Supervisory Liability

A. Omar sues Bandemer and Robert Roes 1-3 in their individual capacities as supervisors. He alleges that they were deliberately indifferent to but not direct participants in Weyker's alleged violations.

A supervisor sued in his or her individual capacity in a § 1983 or *Bivens* suit "is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677; *see also S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Krigbaum*, 808 F.3d at 340 (citing *Livers*, 700 F.3d at 355). "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." *Id.* The notice prong requires that "[t]o impose supervisory liability, other misconduct [allegedly giving the supervisor notice] must be very similar to the conduct giving rise to liability." *Id.* (quoting *Livers*, 700 F.3d at 356).

First, given the Court's conclusion that A. Omar has not adequately alleged a constitutional violation by Weyker, the supervisory liability claims "automatically fail for lack of an underlying constitutional violation." *Mendoza v. U.S. Immig'n & Customs Enf't*, 849 F.3d 408, 420 (8th Cir. 2017) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986)).

Moreover, A. Omar's complaint, which is practically identical to Osman's complaint as to the supervisory liability allegations, likewise contains few allegations—and fewer well-pleaded facts—regarding supervisory liability. Like Osman, he alleges that Bandemer and the

Robert Roes had supervisory responsibility over Weyker, *see, e.g.*, FAC ¶¶ 7, 9; that the investigation was very important to the St. Paul Police Department vice unit, *id.* ¶ 35; and that "[b]y February 12, 2012, at the latest, Bandemer and the other supervisory Defendants and the City had actual notice of the falsity of the allegations put forth by Weyker," based on district court orders including the memorandum-order at Dkt. No. 1392 and because of news coverage, *id.* ¶¶ 46, 55-56. Like Osman, A. Omar cites *United States v. Mohamud*, No. 3:10cr260, 2013 WL 1935506, at *11 n. 6 (M.D. Tenn. May 9, 2013), and *Adan*, 913 F. Supp. 2d at 589 n.10, in support of his supervisory liability notice allegations. FAC ¶ 56.

As explained in the Osman Opinion, these allegations do not sufficiently plead supervisory liability based on notice. *See* Osman Op. 37-41. Nor do they establish a pattern of unconstitutional acts by Weyker. Ignoring conclusory or unsupported allegations, A. Omar does not allege any other similar acts by Weyker before her Tennessee Case investigation that could show a pattern about which Bandemer or the Robert Roes personally knew.

The allegations fail to state a claim for supervisory liability, and Bandemer and Robert Roes 1-3 are entitled to qualified immunity as to these counts.

### c. Municipal Liability

A. Omar sues St. Paul as well as Bandemer and the Robert Roes in their official capacities for municipal liability under *Monell v. Dept. of Social Servs. of the City of New York*, 436 U.S. 658 (1978). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. "Instead," a municipality is liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Id.*

A plaintiff therefore must show that there is an "official" policy or a "custom or usage

with the force of law." *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016). A plaintiff must plead "allegations, reference, or language by which one could begin to draw an inference that the conduct complained of . . . resulted from an unconstitutional policy or custom." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (citation omitted). Absent allegations of an official policy that was the moving force behind the violation, "[m]isconduct among a municipality's employees must be 'continuing, widespread, [and] persistent' to establish such a custom." *Kelly*, 813 F.3d at 1075 (citation omitted). Also, "the municipality will not be liable unless policymaking officials exhibit '[d]eliberate indifference to or tacit authorization of such conduct . . . after notice to the officials of that misconduct." *Id.* at 1075-76 (citation omitted). The question is whether a "governmental policy or custom was the 'moving force' that led to the deprivation of [the plaintiff's] constitutional rights." *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002). Even if no individual employee is found liable, a municipality might be liable, but only where "the combined actions of multiple officials or employees may give rise to a constitutional violation." *Id.*

A. Omar alleges that Weyker acted alone, with little supervision. *See, e.g.*, FAC ¶ 45. He does not allege facts to support conclusory allegations that Weyker or other St. Paul Police Department employees fabricated evidence in other investigations. For the same reasons given in the Osman Opinion, *see* Osman Op. 41-42, A. Omar's municipal liability allegations also fail.

**VI. Conclusion**

Defendants are entitled to qualified immunity on all counts, because A. Omar's complaint fails to plausibly allege a violation of his constitutional rights. The Court grants the Defendants' motions and dismisses with prejudice. *See Ulrich v. Pope Cty.*, 715 F.3d 1054, 1060-61 (8th Cir. 2013); *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 635 (8th Cir. 2010).

The Court will not grant leave to amend based on a request made in passing at the end of a brief without complying with local rules or in any way indicating what changes might be made. *See In re Baycol Prod. Litig.*, 732 F.3d 869, 880 n.8 (8th Cir. 2013).

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants Heather Weyker and John Bandemer's Motion to Dismiss [Dkt. No. 40] is GRANTED.

2. Defendant City of Saint Paul's Motion for Judgment on the Pleadings [Dkt. No. 46] is GRANTED.

3. Plaintiff Abdifatah Sharif Omar's First Amended Complaint is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 9, 2017
s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge